## Case No. 16,522.

### UNITED STATES v. TILDEN.

[10 Ben. 566; [1] 25 Int. Rev. Rec. 352.]

District Court, S. D. New York.    Oct. 31, 1879.

#### DEPOSITIONS DE BENE ESSE — PRODUCTION OF BOOKS AND PAPERS.

A witness examined de bene esse under Rev. St. U. S. § 863, may be compelled to produce books and papers in his possession which would be material and competent evidence for the party calling him, upon the trial of the cause, but he cannot be compelled to produce his books and papers merely for the purpose of refreshing his memory.

[Suit by the United States against Samuel J. Tilden to recover money alleged to be due as taxes on income.]

S. L. Woodford, U. S. Dist. Atty., and S. B. Clarke, Asst. U. S. Dist. Atty.

Wm. Allen Butler, for witness.

CHOATE, District Judge. On the 28th day of October, 1879, the district attorney took out a subpœna duces tecum directed to James B. Colgate, requiring him to attend on the 29th day of October, at 9 o'clock a. m., before a circuit court commissioner, named therein, to give evidence de bene esse in this cause on the part of the plaintiff, and requiring him also to have with him books and papers described as follows: "All and singular, the books, papers, writings and documents now in your custody or under your control, which show or in any manner relate to any gains, profits or income, made, gained, had, derived or received by, for, or on account of Samuel J. Tilden, the defendant, at any time between the first day of January, 1862, and the 31st day of December, 1871." This subpœna was issued from the clerk's office upon the filing of an affidavit of one H. H. Mason, that he knew the said Colgate and that on the 28th day of October, 1879, the said Colgate told him that he was going to Europe in a few days. On the 29th of said October, at the hour named, the said Colgate appeared before the commissioner and his examination de bene esse was proceeded with, the attorneys of both parties to the suit attending. He testified that during the period named in the subpœna his firm of Trevor & Colgate had some transactions with the defendant in the buying and selling of stocks; that they bought and sold stocks on defendant's orders; that he did not remember any particular orders; that he thought it probable and had no doubt that they had such transactions for the defendant in the stocks of the Pittsburgh, Fort Wayne & Chicago Railroad Company during the said period, but that his recollection was not clear; that he had no recollection as to the number of shares purchased or sold; that he did not recollect any such transactions in any other stock but had no

doubt there were others. The witness was asked whether the stock was purchased for the defendant alone or for him in connection with somebody else, and he answered that he should have to refer to his books to find out. He was asked what books he had got by which he could refresh his memory on that subject, and he answered, the books of that date, if they could be found; that he presumed the ledgers would be the principal books and that he presumed that there were other books that might throw light on the subject, the cash books; that these were the only books he knew of to refresh his memory by; that these, the ledgers and the cash books, were the principal ones. Being further examined as to the books required for this purpose of refreshing his memory, he said that he could refer from one book to another, and that he could not tell what books he would want until he got at it. He testified that he kept books that might be called daily blotters, and which he called cash books; that he did not know whether he kept books called daily blotters; that he did keep books called cash books, and journals, memorandum books, in which purchases and sales of stocks were originally entered. All the foregoing questions related to books kept in the years 1862 to 1871, inclusive. He further testified that he did not know whether the books above referred to had been preserved; that if he was going to search for them he would look in the attic; that all such books, if preserved, were kept in the custody of his present firm of James B. Colgate & Co., successors to Trevor & Colgate. Being asked whether the defendant advanced any money for the purchase of the Fort Wayne, etc., stock above referred to, he answered that he could not tell without examining his books; that he presumed he did; that if his firm purchased any of said stock in which the defendant was interested, it was about the time of a reported lease of the railroad in the year 1869. Being asked if his firm sold at a profit any of this stock in which the defendant was interested, he said he could answer the question after an examination of his books; that he could not answer it now. At this stage of the proceedings the plaintiff's counsel requested the witness to produce all the ledgers, journals, memorandum books of the purchase and sale of stocks and daily blotters, cash books and check books which relate, in any way, to the purchase and sale of certain specified numbers of shares of the stock of the Pittsburgh, Fort Wayne & Chicago Railway Co., giving certain dates between March 4th and April 3d, 1869, with a certain number of shares for the several dates. The proceeding was then adjourned to October 30th, 10 a. m. On the morning of October 30th, 1879, the district attorney took out another subpœna duces tecum directed to the witness and requiring him to appear before the same com-

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

missioner on the 30th of October, at 10 a. m., as a witness on behalf of the plaintiff, and to have with him books and papers described as follows: "All and singular, the daily blotters, memorandum books of the purchase and sale of stocks, journals, cash books, check books and ledgers kept by or for the firm of Trevor & Colgate during the period commencing on the 1st day of January, 1869, and ending on the 31st day of December, 1869, now in your custody or under your control, and all books, papers, writings and documents now in your custody or under your control, which show or in any manner relate to the purchase and sale of, and the disposition of the proceeds of the sale of the following numbers (or thereabouts) of shares of the stock of the Pittsburgh, Fort Wayne & Chicago Railway Company, purchased on or about the following dates," giving the same dates and numbers of shares given in the foregoing request to produce.

The witness attended at the time to which the proceeding had been adjourned and the counsel for both parties appearing, his examination was resumed. He admitted that he had been served with the subpœna last referred to, and declined to produce the papers referred to therein under advice of counsel, denying the right to compel their production. At the request of the district attorney the counsel for the plaintiff and the witness appeared before the court, and argument was heard on the question whether the witness was bound to produce the papers described in the second subpœna.

No objection has been taken to the shortness of the time allowed for the production of the books and papers, nor to the sufficiency of the preliminary proof by affidavit on which the subpœna was issued. The district attorney conceded on the argument that the books and papers were required, not because they are competent evidence in the cause, but because they are necessary for the purpose of refreshing the recollection of the witness in respect to facts pertinent to the issue in the cause. It is conceded that the books of the witness could not be used as evidence in the cause.

It is insisted on behalf of the witness: (1) that under Rev. St. § 863, the court has no power to compel by subpœna duces tecum the production of books and papers of the witness upon an examination de bene esse before trial; (2) that if such production can be compelled at all, the proceedings must be according to the provisions of the New York Code of Civil Procedure, which requires by section 867 for such production of books by a witness upon a trial or hearing, special application to and order of the court and a notice of a given number of days; and (3) that if in any case under Rev. St. § 863, a subpœna duces tecum will issue, it will not issue to require the production of books and papers merely to refresh the recollection of the witness upon his examination.

1. Upon the first point it is argued that the court has no power in the premises except what is given in Rev. St. § 863; that this only provides that in the cases specified, a person may be compelled to appear and testify; that this section contains no provision authorizing the party taking the deposition to require the production of books or papers; that in sections 868–870, regulating the taking of depositions under a commission issued by a federal court, special provisions are made for the production of books and papers by the witness upon proof to the satisfaction of the court that a necessary case exists therefor; that it is unjust and oppressive to require a third party, having no interest in the suit, to produce upon the mere call of one of the parties by a subpœna. any or all of his private books of account and papers, often to his great inconvenience. the derangement of his business and possible injury from the exposure of his private business affairs Attention is called to the fact that among the magistrates before whom the witness may be thus summoned, are notaries public and some other officers having little or no judicial character or experience, and that, by the settled construction put on this and similar laws for the taking of testimony out of court, the magistrate taking the same has no discretion as to the reception or rejection of testimony, but must take whatever is offered, thus greatly increasing the risk of injury to the witness and his affairs. And this argument. from the inconvenience of the thing, is urged as a reason for the strict construction of this section in this particular and against a construction which would involve these mischiefs. It is further argued from the careful provisions of law designed to protect parties from an improper inspection of books and papers, that no such right to require the production of those of a witness in this loose way and without special proceedings for that purpose can exist, the argument being that it cannot have been intended that indifferent third persons, having no interest in the controversy, shall have less protection in this respect than parties to suits.

The question is one of great importance and no decisive authority is cited on either side. In the case of Ex parte Peck [Case No. 10,-885], Judge Betts expressed a doubt whether upon the examination of a witness de bene esse under the 30th section of the judiciary act of 1789 [1 Stat. 73], of which Rev. St. § 863. is a re-enactment, there was any power to compel the production of books and papers. The case did not call for a decision of this point. I have given the question as full consideration as a very limited time for examination will allow, and have reached the conclusion that under this section it is competent for the court to issue a subpœna duces tecum to compel the production, upon the examination. of books and papers which would be competent evidence in the cause.

This provision for the examination of wit-

nesses de bene esse before the trial, first enacted in the act of 1789, has been said to be a novelty in legislation. Until a statute of the first year of William IV. (1831), there was no English act of general application giving parties in common law actions this relief against the probable loss of testimony from the absence or death of witnesses. Prior acts, beginning in the reign of George III., gave partial relief, limited mostly to the taking of testimony of persons in the remote colonies or dependencies of the realm. Prior to this more recent statute, the courts of common law, impressed with the hardship and injustice resulting from such loss of testimony, forced parties to consent to the taking of testimony by postponing causes, refusing to enter nonsuits or judgments in case such consent was unreasonably declined, and by other like rude devices. The power to issue commissions for the taking of testimony of witnesses, except in foreign countries, had a very limited application within the kingdom and afforded no sufficient protection against this evil. See the English cases and statutes; 2 Phil. Ev. (4th Am. Ed.) p. 843 et seq. In New York it was not till after this enactment by congress that any such statute was passed, but the practice in substantial conformity with the statutes afterwards passed was recognized as proper, independently of any statutory authority. See Mumford v. Church, 1 Johns. Cas. 147; Sandford v. Burrell, Anth. N. P. 250; Jackson v. Kent, 7 Cow. 63; Wait v. Whitney, Id. 69. Indeed the first statute in New York is declared by the revisers to be founded on these early cases. 1 Rev. Laws, 455. The general course of proceeding was by a special application to the court and an order for the examination based on proof of the essential facts making the relief necessary, and not by the issue of a subpœna properly so called.

The purpose of this act of congress undoubtedly was to provide a convenient and effectual remedy for this possible failure of justice from the anticipated loss of material testimony, and also for the relief of witnesses living at such distance from the place of trial that they could not reasonably be required to attend in person, which reasonable limit of distance was fixed at a hundred miles, although it was probably competent for congress to authorize the summoning of a witness to attend the trial from any part of the United States. And the statute provided that "whenever the testimony of any person shall be necessary in any civil cause depending in any district in any court of the United States, who shall live at a greater distance from the place of trial than one hundred miles or is bound on a voyage to sea, or is about to go out of the United States, or out of such district, and to a greater distance from the place of trial than as aforesaid, before the time of trial, or is ancient or very infirm, the deposition of every such person may be taken de bene esse," etc.

"Every person so deposing, as aforesaid, shall be carefully examined, etc., and sworn to testify the whole truth," etc. "And any person may be compelled to appear and depose as aforesaid, in the same manner as to appear and testify in court." 1 Stat. p. 88. It is impossible, I think, to escape the conclusion that the purpose of the statute was to give parties, in all substantial respects, the full benefit of the testimony of witnesses to material facts, whose testimony they were liable to lose from age, infirmity or departure from the country, and also of witnesses living at a greater distance from the court than one hundred miles, who, for their own convenience, were to be excused from attending. The statute thus debars the parties from calling into court witnesses residing more than one hundred miles from the place of trial, even though living within the jurisdiction and, but for the statute, within reach of the subpœna of the court. This extension of the provision to distant witnesses very clearly requires, as it seems to me, that a construction should be given to the statute which shall not substantially deprive the parties of the benefit of their testimony. And considering the very large proportion of civil causes in which the testimony of witnesses, respecting books and writings in their possession and material to be put in evidence on the trial, is absolutely essential to the proper enforcement of the rights of one party or the other, the statute would, as it seems to me, fail of its intended purpose and effect if the parties were debarred by it from the compulsory production by witnesses more than a hundred miles from the place of trial, of papers material as evidence in the cause. While the statute, as being in derogation of the common law, must be strictly followed as to the course of procedure prescribed by it (Bell v. Morrison, 1 Pet. [26 U. S.] 355), yet it must have a fair and reasonable construction, having regard to the particular purpose it was intended to subserve and the special evils it was designed to remedy. It is to be observed, also, that at the time of its enactment it was the only statute of the United States in force making any provision for the compulsory attendance for examination of witnesses out of court, to be used upon trials in the federal courts. The statute regulating the attendance of witnesses under examination on commission, and providing that the courts of the district in which they might be examined should compel their attendance, and the production by them in proper cases of books and papers (now Rev. St. §§ 868–870), was not passed till 1827, nearly forty years later. [4 Stat. 197.] And although this statute of 1789 declares that "nothing herein shall be considered to prevent any court of the United States from granting a dedimus potestatem to take depositions according to common usage when it may be necessary

to prevent a failure or delay of justice," yet I think it cannot be claimed that this proviso effectually supplied, or was understood by congress to supply, the defect in the statute for de bene esse examinations of witnesses beyond a hundred miles from the place of trial, and as furnishing other effectual means of compelling the production of material books and papers by such distant witnesses, since it was not till long afterwards that any statute was passed giving to the courts the power to compel such production of books and papers in case of witnesses examined under commission. There was one large class of causes, that might arise under laws relating to patents, contemplated from the beginning as liable to be pending in the federal courts, although no patent law had then been passed, to which this reasoning applies with special force. In another large and important class of federal causes, admiralty suits, which were clearly within the view of the framers of this law at the time of its enactment, this construction of the act is peculiarly necessary, since from the occupation of the witnesses they must be tried largely upon depositions. But the urgent necessity for this construction is by no means confined to any particular class of cases. The argument that a subpœna duces tecum is not named in the statute, nor the matter of the production of books and papers, is, I think, sufficiently met by saying that such mention was wholly unnecessary. The provision for compelling obedience on the part of the witness was in these words: "Any person may be compelled to appear and depose as aforesaid, in the same manner as to appear and testify in court." It was for a long time considered doubtful whether this power of compulsion was conferred upon the magistrate who was empowered to take the examination or upon the court of the district in which the examination is taken. The latter view has prevailed. Ex parte Humphrey [Case No. 6,867]; Ex parte Peck [Id. 10,885]; Ex parte Judson [Id. 7,561]. The words "may be compelled in the same manner as to appear and testify in court," refer to the instrumentalities then in force in the common practice of the courts for compelling the attendance and the testimony of witnesses, the writ of subpœna and the power to punish disobedience to a lawful order as a contempt. This is the practical construction which these words have received. (Cases last cited.) The writ of subpœna duces tecum was, equally with the subpœna ad testificandum, and in certain cases the writ of habeas corpus ad testificandum, such an instrumentality in common use. The failure to mention it or to define the instrumentalities further than by a general reference, broad enough to include it, constitutes, as it seems to me, no valid argument for its intended exclusion, when the evident purpose of the act and the construction necessary for its beneficial operation are considered.

The argument, drawn from the comparison between section 863 and the sections of the Revised Statutes regulating the compulsory attendance of witnesses and their production of books and papers upon the examination, would have great weight if they were contemporaneous statutes. If these other provisions had been contained in the judiciary act of 1789, it could be argued with great force that this especial provision for producing books and papers in the one case and the omission of such provision in the other, showed an intention to discriminate between the two cases in this particular. But, as pointed out above, these provisions are enactments of forty years later, when it appears to have been found necessary to supply, in case of examinations under commissions, this very power to compel compliance on the part of the witness with the conceded right of the party to take his testimony. It would seem that the beneficial and convenient exercise of the power to examine witnesses de bene esse, under the act of 1789, had been so generally availed of that it was not till 1827 that congress was called upon to pass an act giving like powers in this other class of examinations. The terms in which the power is granted are more in detail than in the old statute, and certainly some valuable safeguards against the abuse of the power are embodied in the statute itself. But it seems to me that this furnishes no reasonable aid in the construction of that part of the earlier law now in question; that is to say, as to what is meant by "the same manner as to appear and testify in court," except that the special provision for compelling the production of books and papers when material as evidence in the cause is an essential or important part of the relief intended to be given by such a statute. And it is to be observed, further, that the English act of 1 William IV. c. 22 (6 Eng. Rev. St. p. 849), above referred to and passed in 1831, contained a similar provision to that in the act of congress of 1827, for the production upon the examination of books and papers.

I have not overlooked the possible inconveniences and dangers to the private and business interests of witnesses, so strongly urged as a reason for excluding the construction which allows the issue of a subpœna duces tecum in such a case. But while the law jealously protects private books and papers from unreasonable searches and seizures, and from unnecessary exposure, even when necessarily produced in court, yet the principle is equally strongly held that parties litigant have the right to have private writings which are competent for proof in their causes produced in evidence; and to this imperative demand of justice, all scruples as to the confidential character of the writings as private property, except in certain well-ascertained

exceptions growing out of professional employment, must yield from considerations of public policy. The argument has gone largely upon the terms of this statute, as it now exists, in the Revised Statutes, which extends the power to take these depositions to all notaries public. It must be admitted that this extension increases the possibility of inconvenience and perhaps of positive injury in the operation of the statute; but the question is to be determined upon the act of 1789, which has not, in the particulars under discussion, been materially changed, and which conferred the power only on a justice or judge of the United States, a chancellor, justice or judge of a supreme or superior court, mayor or chief magistrate of a city, or judge of a county court or court of common pleas of any of the United States, all being judicial officers of considerable experience, except mayors of cities, who, at the time the act was passed, might certainly be presumed to be persons of great intelligence and experience in the conduct of business, and, at that time, very few in number. Congress, in extending the class of examining officers for reasons of public convenience so as to include notaries public, seems not to have appreciated highly the supposed greater dangers to which witnesses might be thereby subjected. And perhaps it was regarded as a sufficient protection against the abuse of this process, that the courts of the United States have full power by general rules, or special orders in the absence of general rules, to check and guard against the abuse of the processes of the court. Thus, if this power of subpœnaing witnesses to produce books and papers were found to be used oppressively upon witnesses, it would seem to be competent for the courts to prevent it by requiring by their rules a compliance with reasonable conditions as to the preliminary proof of the necessity for the production of the books and papers and of their materiality as evidence is the cause.

2. The claim made on behalf of the witness that no subpœna duces tecum can issue except under the provisions governing the practice in the New York Code of Civil Procedure, seems to rest wholly on Rev. St. § 914, assimilating the practice of the courts of the United States, in civil causes other than cases of equity and admiralty, to the practice in the state courts. This section has been held not applicable to matters specially regulated by act of congress, as this matter of depositions de bene esse appears to be. Beardsley v. Littell [Case No. 1,185].

3. Finally, it is objected that no subpœna duces tecum will issue merely to compel the production of books and papers to be used on the examination to refresh the recollection of a witness. Books and papers are, as matter of practice, constantly used in court upon the examination of witnesses for the purpose of refreshing their memory. In some cases, it may well be that this opportunity to refresh the memory of a witness called in a cause may be of great value to a party. But it certainly is a startling and I believe a novel proposition, that a merchant or broker or banker may be subpœnaed to produce all his books of account and all his business papers during a period of ten years, as was substantially attempted in this case, upon a mere possibility that out of this mass of books and papers some might be found whereby he could refresh his memory, if it should, upon his examination, appear that his memory needed refreshing on some point on which he should prove to be able to give testimony competent in the cause. No precedent is produced for this exercise of power, nor has any statute or decision been found or cited which appears to recognize or authorize the compulsory production of books and papers for such a purpose, the same not being relevant or material to the cause. While there is a possibility of failure of justice in special cases from an inability to resort to this means of refreshing the memory of a witness, it seems to me clear, that this evil is not of so substantial importance as to require a construction of this statute so extremely liberal in favor of parties litigant and so inconvenient and oppressive to witnesses and so beyond all precedent in the practice of examining witnesses out of court. It has been well pointed out that in such examinations, on account of the limited power of the examining magistrate, persons summoned for such examination have less chance of protection against the oppressive and injurious use of this power of the court than upon a trial in court where all questions arising can be submitted to and decided by the court as they arise. And I am satisfied that the statute in question does not require a construction permitting such a compulsory production of a witness's books and papers. A very strong if not a controlling argument in support of this view, is to be drawn from the terms of the statute of 1827, above referred to. In providing for the regulation of this very matter in examinations under a commission or dedimus potestatem, it expressly limits the compulsory production of books and papers to such only as would be "if produced, competent and material evidence for the party applying therefor." This is a legislative declaration of the highest possible character, as it seems to me, that this was as far as the policy of the law goes in the matter of compelling the production of books and papers on the examination of witnesses out of court, and all that substantial justice requires in this direction, having a due regard to the rights, the convenience and the interests of other persons as well as of the parties litigant. No reason can well be imagined for supposing that congress would withhold from this class of examinations under commission, where the commissioners are appointed by the court and the mode of interrogation is prescribed before the examination under the direction of the court itself, as full an authority to compel the production of books and papers by the witness as

is allowed on an examination de bene esse, which is subject to less restriction and supervision. This act, therefore, seems to show that congress understood that this was the limit allowed for the compulsory production of books and papers under the system of examinations de bene esse then in force.

The circumstance that in supposable cases there may be even a serious failure of justice by reason of the inability of a court to exercise a certain power, is not in itself the test of the existence of that power. The question always is, does the statute, fairly construed, having in view its purpose and its effect, authorize the exercise of the power? Our machinery for administering justice is not and must not be expected to be found absolutely perfect in its operation. There are cases of hardship and possible injustice, not provided for; and whether or not they can be properly provided for with a due regard to all other public and private interests entitled to be considered in connection with any proposed alteration of the law, is, of course, exclusively a question for the legislature and not for the courts.

It must be held, in this case, that there was no authority to compel the production of the witness's books and papers merely to refresh his memory, and for this reason his refusal to produce them is sustained.